IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT MICHAEL MILLER, | No. C -13-01856 EDL |
| Plaintiff, | **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** |
| v. | |
| SHAYNA OLESIUK, et al., | |
| Defendants. | |

Before the Court in this employment discrimination case is Defendant Martin Gruenberg's Motion to Dismiss. Defendant argues that the Court lacks subject matter jurisdiction and that Plaintiff has failed to state a claim upon which relief could be granted. The motion to dismiss has been fully briefed. Because this matter was appropriate for decision without oral argument, the Court vacated the August 27, 2013 hearing. For the reasons stated in this Order, Defendant's Motion to Dismiss is granted without leave to amend because the Court lacks subject matter jurisdiction. Thus, the Court need not reach Defendant's arguments that Plaintiff has failed to state a claim.

**Allegations in the complaint**

Plaintiff makes the following allegations. Plaintiff was hired by the Federal Deposit Insurance Corporation ("FDIC") on March 10, 2008 as an Economic Analyst, grade CG-9. First Am. Compl. ("FAC") ¶ 24. When he was hired, Defendant Olesiuk, the Regional Manager for the Division of Insurance and Research ("DIR"), San Francisco Regional Office ("SFRO") for the FDIC and Plaintiff's first line supervisor, told Plaintiff that his position had a full-performance level of grade 12, but there would be promotion potential up to grade 14 at his current duty station. FAC ¶ 24. Plaintiff was promoted to CG-11 on March 15, 2009, attained career tenure on March 10, 2010, and was promoted to the full-performance grade of CG-12 on March 14, 2010. FAC ¶ 26.

On February 22, 2011, Olesiuk and Plaintiff discussed his 2010 performance, and Olesiuk stated that she intended to promote Plaintiff and Ryan Wat, another Economic Analyst, to Regional

Economist, grade 13. FAC ¶ 27. Olesiuk also told Plaintiff that she had scheduled him to make several presentations at FDIC field offices during 2011. FAC ¶ 29. Presentations would have had a positive impact on Plaintiff's performance review and prospects for promotion. FAC ¶ 30. Plaintiff requested to work on a detail at the FDIC headquarters in Washington, DC during the summer and Olesiuk agreed to the detail. FAC ¶ 29. On April 13, 2011, Olesiuk notified Plaintiff by email from Washington, DC that she did not need him to attend a previously-scheduled presentation for the Berkeley Economics Club, citing smaller than expected attendance. FAC ¶ 32.

On April 18, 2011, Olesiuk notified Plaintiff that she had received reports of harassment allegedly committed by Plaintiff. FAC ¶ 33. Olesiuk told Plaintiff that there would be an investigatory interview, and that the investigation could result in disciplinary action up to and including removal from the federal service. FAC ¶ 33. Olesiuk notified Plaintiff of his right to have a Union representative present at the interview. FAC ¶ 33. In response to Plaintiff's request for more information, Olesiuk stated that she had no further information, but later identified the complainants as "some female co-workers." FAC ¶ 34. Olesiuk confirmed that the cancellation of the presentation at the Berkeley Economics Club was due to the allegations. FAC ¶ 35. Also on April 18, 2011, Plaintiff learned from John McGee, a Senior Financial Analyst, that Olesiuk was making inquiries about sexual harassment, and that she had told the people she was interviewing not to discuss the matter. FAC ¶ 36.

Plaintiff stated that through a FOIA request, he learned that the initial complainant had not worked for the FDIC for almost one year before she complained to Olesiuk. FAC ¶ 103. Plaintiff stated that in the intervening year, the initial complainant had several voluntary contacts with Plaintiff for coffee or lunch. FAC ¶ 104. Plaintiff stated that the complainant did not make any contemporaneous complaints or appear uncomfortable. FAC ¶ 104. Plaintiff stated that in March 22, 2011, the complainant, Wat and Plaintiff were joking over lunch about things said and done by Charlie Sheen and the movies he had been in. FAC ¶ 105. Plaintiff stated that the complainant "initiated and gleefully participated in the conversation." FAC ¶ 105. The complainant was depressed after breaking up with her boyfriend and had asked Plaintiff and Wat for advice regarding her relationships. FAC ¶ 105. Plaintiff stated that during her employment, complainant wore

2

inappropriate clothing to work that invited attention. FAC ¶ 106. She occasionally showed signs of inebriation or hangover at work. FAC ¶ 106. Plaintiff stated that the complainant talked to male co-workers about sexuality and inquired about their relationships. FAC ¶ 106. Complainant referred to a male employee's biceps as a "gun show," and made complimentary comments about the clothing that men wore. FAC ¶ 106. Plaintiff stated that during the investigation, Olesiuk did not inquire into "the welcomeness, subjectively offensiveness, or effect on the work environment of any of the complainants," and did not ask many of the questions recommended by the Equal Employment Opportunity Commission ("EEOC") in investigating sexual harassment. FAC ¶ 110.

On April 14, 2011, Defendant Crosser, the Human Resources Director for the Division of Administration in the SFRO, wrote an email to Olesiuk stating that Defendant Lander, a Labor and Employee Relations Specialist, was of "two minds" about whether to immediately order Plaintiff to stop harassing behaviors or "preserve a surprise element" during the investigatory interview. FAC ¶ 101. Crosser also stated that there was a "lack of reports/complaints recent or current harassing behavior [sic]," and that it was necessary to interview current interns. FAC ¶ 101.

Also on April 18, 2011, two female interns entered Plaintiff's office without permission to discuss work-related matters. FAC ¶ 37. At around 3:00 p.m., Plaintiff informed Olesiuk that he felt nauseated and severely anxious working closely with people who were potential complainants, and he requested to work from home until after the investigatory interview, which Olesiuk approved. FAC ¶ 37. Plaintiff worked two additional hours that day to complete tasks that could not be done from home. FAC ¶ 37.

Plaintiff notified Olesiuk that the two additional hours would put him over the limit of twenty-four hours that could be carried past the end of the pay period, and that he would need to use those hours before the end of the pay period or he would lose them. FAC ¶ 38. Plaintiff and Olesiuk agreed to "play it by ear" with respect to Plaintiff using his two credit hours for a partial day of telework on April 19, 2011. FAC ¶ 38. On April 19, 2011, Olesiuk rescinded the agreement to work from home by email, and ordered Plaintiff to return to the office on April 20, 2011. FAC ¶ 39.

Plaintiff feared asking for Union representation at the investigatory interview because one of the female workers in his department was the secretary of the local Union chapter, but eventually,

3

Plaintiff contacted the Union about the interview. FAC ¶ 40. The Union requested a continuance of the interview from April 21, 2011 to April 25, 2011. FAC ¶ 40.

On April 25, 2011, Olesiuk and Defendant McKenna, a Labor Relations Specialist for the Division of Administration ("DOA") SFRO, conducted the investigatory interview. FAC ¶ 41. Plaintiff was accompanied by Union representative Jill Duronslet. FAC ¶ 41. McKenna asked preliminary questions regarding Plaintiff's duty position and tenure, and about Plaintiff's working relationship with student interns and new employees. FAC ¶ 41. Plaintiff stated that he would conduct training and provide assistance to them, but had no supervisory role over interns or new employees. FAC ¶ 41. McKenna asked Plaintiff whether he was aware of the FDIC anti-harassment policy, and Plaintiff stated that he was but that he was unaware of anything he had done to violate the policy. FAC ¶ 42. McKenna stated that the allegations had not been reviewed by FDIC's counsel. FAC ¶ 44.

At the interview, Olesiuk asked questions relating to the allegations, but did not say who made the complaints, when they occurred, where they occurred, how they occurred, or whether there were any witnesses. FAC ¶ 45. The allegations included that:

> (1) Plaintiff made comments about the clothing that female employees wore to the office and that he preferred when female employees wore shorter dresses or skirts and low-cut shirts;
> (2) following lunch with a co-worker who had a young baby and a female employee, Plaintiff leaned over the desk chair of the female employee and whispered in her ear that there is nothing like having sex when you are trying to get pregnant;
> (3) Plaintiff complained to a co-worker about a lack of intimacy with his wife and tried to ask the co-workers about her own personal life in this area;
> (4) Plaintiff stated that "the only reason the FDIC hires female interns is so there's something nice to look at in the office;" and
> (5) when an employee wore a skirt to the office, Plaintiff would go to her desk and stare at her legs for a prolonged period of time.

FAC ¶ 46. Plaintiff denied all of the allegations. FAC ¶ 47. Plaintiff knew several female employees and some who had young babies, so he feared interaction with all women after the interview. FAC ¶ 48.

Since April 18, 2011, Plaintiff has been unable to get restful sleep and has suffered severe anxiety. FAC ¶ 51. On April 29, 2011, Plaintiff went to the emergency room at the San Francisco Veteran's Administration Medical Center seeking behavioral health counseling and medication to

help him sleep. FAC ¶ 51. Plaintiff has been in counseling for about two years. FAC ¶ 52.

On May 3, 2011, Olesiuk sent Plaintiff a Letter of Warning ("LOW") by email. FAC ¶ 53. The LOW stated that four of the five allegations described above violated the FDIC's anti-harassment policy, and that further violations could result in removal of Plaintiff from the federal service. FAC ¶ 54.

On May 4, 2011, Plaintiff wrote to Olesiuk demanding that she abide by the collective bargaining agreement by delivering the warning in person, notifying Plaintiff of his rights to appeal and grieve the letter and providing him with the evidence supporting the allegations. FAC ¶ 55. Later that evening, Plaintiff realized that a letter of warning was among the informal actions in the FDIC disciplinary policy. FAC ¶ 56.

On May 5, 2011, Olesiuk replied by email that Plaintiff had failed to appropriately research the disciplinary policy, and criticized the length and tone of Plaintiff's email. FAC ¶ 57. Olesiuk ordered Plaintiff to attend a course entitled "Communicating with Tact and Diplomacy," which overlapped with the dates that Plaintiff was to give a presentation at a field office. FAC ¶ 57.

On May 4, 2011, Defendant Kalser, an Assistant Director of Regional Operations, DIR-SFRO and Plaintiff's second-line manager, attended a meeting in which Plaintiff described some research that he was doing. FAC ¶ 58. After the meeting, Kalser directed Olesiuk to change the focus of Plaintiff's paper from a national scope to a regional scope. FAC ¶ 58. On May 18, 2011, Kalser directed a higher-graded Financial Analyst to pursue research on the same topic. FAC ¶ 58.

On May 5, 2011, Kalser spoke with Plaintiff regarding the allegations and stated that they were "serious charges," and that she and Defendant Brown, the Chief Economist and Associate Director of Regional Operations, Division of Insurance and Research, and the third-level manager for Plaintiff, were very concerned. FAC ¶ 59. Kalser told Plaintiff that interns needed to be treated with respect, and that Plaintiff needed to work to "repair the damage." FAC ¶ 59.

On May 6, 2011, Olesiuk emailed Plaintiff a copy of an FDIC Policy Circular entitled Procedures for Providing Reasonable Accommodation to Individuals with Disabilities. FAC ¶ 60. Plaintiff notes that this was after Plaintiff complained of emotional distress and after he had already sought treatment for acute symptoms of distress. FAC ¶ 60.

5

On May 9, 2011, a delegation of representatives from China's central bank contacted Plaintiff to arrange a meeting. FAC ¶ 115. Even though Plaintiff has previously met with this delegation in Washington, DC in 2009, Olesiuk did not permit Plaintiff to participate in the meeting on May 24, 2011, but she allowed two female interns to attend. FAC ¶ 115.

On May 25, 2011, Plaintiff learned from Olesiuk that a job to which Plaintiff could have been promoted at grade 13 was being instead offered at grade 9. FAC ¶ 61. Olesiuk stated that the decision to offer the position at grade 9 instead of grade 13, which would be a promotion for Plaintiff, was related in part to the allegations of sexual harassment against Plaintiff. FAC ¶ 62. Plaintiff asked Olesiuk about the presentations that had been cancelled and Olesiuk stated that: "Management of hesitant to let [Plaintiff] do presentations because they are afraid of what [Plaintiff] might say." FAC ¶ 62. Plaintiff informed Olesiuk that he was going to initiate a grievance. FAC ¶ 62.

On May 29, 2011, Plaintiff submitted a grievance to Olesiuk, naming her, McKenna, Kalser, Brown and other unknown officials. FAC ¶ 63. The LOW was not grievable, but Plaintiff grieved Defendants' actions as violations of the law, EEOC regulations, FDIC policies, and the collective bargaining agreement. FAC ¶¶ 63-65. Plaintiff represented himself during the grievance. FAC ¶ 63.

The remainder of Plaintiff's complaints appears to concern the grievance procedure that Plaintiff went through and the alleged slights that occurred during his employment. For example, even though Plaintiff had been participating in the editorial meeting for the Weekly Economic Briefing, a report of current financial and economic events submitted to the Chairman and other executives, he stopped receiving email invitations to this Briefing shortly after submitting the grievance. FAC ¶ 66.

The grievance process began on June 28, 2011 with a Step 1 grievance hearing conducted by Olesiuk and Defendant Pfaffenberger, a Human Resources Specialist for the Division of Administration, San Francisco Regional Office. FAC ¶ 71. On July 14, 2011, Olesiuk gave Plaintiff her response that denied all of his allegations and remedies. FAC ¶ 72.

Plaintiff submitted a Step 2 grievance to Kalser, the Step 2 official. FAC ¶ 73. Kalser held

the Step 2 hearing on August 16, 2011, six days after the deadline to do so. FAC ¶ 74. Defendant Lander, a Labor and Employee Relations Specialist, was listening to the hearing as was Ronald Wagner from the Union. FAC ¶ 74. On August 19, 2011, Pfaffenberger requested a telephone meeting with Plaintiff to discuss the options to present to the Step 2 official, and Ronald Wagner listened in on the call. FAC ¶ 75. After Plaintiff denied Pfaffenberger's request for an extension to provide a Step 2 response, Pfaffenberger submitted the Step 2 response one day late on August 26, 2011, which essentially agreed with the Step 1 official and denied all relief. FAC ¶ 76.

Plaintiff submitted his Step 3 grievance to Defendant Murton, the Director of the Division of Insurance and Research, and Defendant Upton-Kea, the Director of the Division of Administration. FAC ¶ 77. Defendant Murton delegated his authority as the Step 3 official to Defendant Ellis, a Deputy Director, Financial Risk Management in the Division of Insurance and Research. FAC ¶ 78. The Step 3 hearing took place in Washington, DC on September 22, 2011, and Pfaffenberger requested and received an extension for the Step 3 response until October 7, 2011. FAC ¶ 80. Ellis issued the Step 3 decision on October 6, 2011. FAC ¶¶ 80, 82. The Union did not take the grievance to Step 4, so the Step 3 decision was final. FAC ¶ 83.

In October 2011, Plaintiff made a protected disclosure that initiated the informal discrimination complaint process on the basis of gender with the Office of Minority and Women Inclusion ("OMWI"). FAC ¶ 84. On October 24, 2011, EEO Counselor Ballard informed Plaintiff that the claim would likely be dismissed because the same subject matter had been discussed in the grievance process. FAC ¶ 84. Plaintiff withdrew his complaint on November 2, 2011, FAC ¶ 84.

On October 31, 2011, Plaintiff contacted the Office of Special Counsel ("OSC") regarding prohibited personnel practices. FAC ¶ 85. Plaintiff also emailed the Office of Federal Operations ("OFO") requesting an investigation. FAC ¶ 86. The investigations sought by Plaintiff were not within the purview of these offices. FAC ¶¶ 85-86.

Plaintiff was offered a position outside of the FDIC, as an Economist with the Department of Homeland Security, but he declined the offer. FAC ¶ 87. Plaintiff was blocked from competition with respect to jobs within the FDIC. FAC ¶ 87.

Plaintiff's complaint contains many examples of employment decisions that Plaintiff believes

7

were adverse to him. For example, Plaintiff states that he received Special Thanks and Recognition ("STAR") awards in 2008, 2009 and 2010, but not in 2011. FAC ¶ 88. He received a STAR award in 2012, but only as part of a group. FAC ¶ 88. In addition, Plaintiff served as an instructor/facilitator for the Career Examiner Program in 2008, 2009, 2010 and 2011, but was not selected for participation in 2012 or 2013. FAC ¶ 89. In December 2011, Kalser refused to publish Plaintiff's research paper on Interest Rate Risk by the end of the rating year. FAC ¶ 90. In 2012, Kalser also refused to publish a paper on the Stockton Bankruptcy by making so many edits that the paper was unrecognizable as Plaintiff's work. FAC ¶ 91. In April 2013, Kalser reassigned the Stockton paper to another analyst without discussing it with Plaintiff. FAC ¶ 91. In December 2011, Olesiuk refused to publish Plaintiff's paper on the Shadow Inventory of Office Space, a new analytical concept which would have contributed to a higher performance evaluation. FAC ¶ 92.

On January 13, 2012, Plaintiff submitted a request for a desk audit. FAC ¶ 94. Two weeks later, Olesiuk stated that Plaintiff's position was appropriately classified. FAC ¶ 94. On April 9, 2012, the FDIC denied a reclassification of Plaintiff's position, and denied Plaintiff's appeal of the desk audit on June 26, 2012. FAC ¶ 95.

On January 16, 2012, Plaintiff applied for and was referred for a position as a Financial Economist in Washington, DC. FAC ¶ 96. A human resources specialist who worked for Defendant Woolford-Ely, who was the Chief Planning and Resource Manager for the Division of Insurance and Research, gave Plaintiff less than 48 hours notice to produce a copy of a recent research paper. FAC ¶ 96. When Plaintiff could not meet the deadline because his most recent published paper was eight years old and his current research deadline was not finished, the human resources specialist asked for, and Plaintiff provided, a letter of withdrawal. FAC ¶ 96.

On January 19, 2012, Plaintiff filed an appeal with the Merit System Protection Board for discrimination and adverse tangible employment actions. FAC ¶ 97. That appeal was dismissed for lack of jurisdiction. FAC ¶ 97. During this process, Plaintiff obtained evidence demonstrating that the grievance decisions contained lies and material misrepresentations. FAC ¶ 97.

On February 7, 2012, Plaintiff wrote to Defendant Gruenberg, the Chairman of the FDIC, describing the conduct of management that he believed violated the law. FAC ¶ 98. Gruenberg's

8

Chief of Staff, Defendant Ryan, responded on February 9, 2012. FAC ¶ 98. Plaintiff responded to Ryan describing the evidence he received that demonstrated unlawful conduct, but Ryan did not respond. FAC ¶ 98. Plaintiff states that Ryan did not take any action to address any problems. FAC ¶ 98.

In March 2012, Plaintiff received a performance evaluation rating of 3 from Olesiuk and Kalser for 2011, which was lower that his ratings of 4 in the two prior years and below average for his job cohort. FAC ¶ 99. Plaintiff filed a grievance to increase his rating to a 4. FAC ¶ 99. Plaintiff stated that this grievance may soon go to arbitration. FAC ¶ 99, n. 30. The following year, Plaintiff received a rating of 3, which eliminated any chance of increasing his rating. FAC ¶ 99. Plaintiff states that in 2013, he filed a formal EEO complaint for gender discrimination with the FDIC regarding the 2012 performance review and that investigation is ongoing. FAC ¶ 99, n. 31.

Plaintiff initiated informal EEO counseling on July 16, 2012, and he began the formal discrimination complaint on August 23, 2012. FAC ¶ 118. On December 10, 2012, the FDIC dismissed the complaint as a collateral attack on the grievance and did not investigate Plaintiff's allegations. FAC ¶ 118. After failing to receive the agency's decision and contacting the OFO in January 2013, Plaintiff received the FDIC's Final Agency Decision on January 31, 2013. FAC ¶ 119. Plaintiff had until March 4, 2013 to request an appeal or grievance review from the OFO, and Plaintiff faxed his request to the EEOC on March 1, 2013. FAC ¶ 120. Plaintiff sent the information to the wrong fax number, and on March 6, 2013, Plaintiff received an envelope with his faxed materials returned by the EEOC. FAC ¶ 120. On March 7, 2013, Plaintiff resubmitted his request to the OFO. FAC ¶ 120. Before the OFO had taken any action, Plaintiff notified the OFO on April 23, 2013 (within 90 days of receiving the Final Agency Decision) that he intended to file a federal lawsuit. FAC ¶ 121. The OFO replied on May 9, 2013 that it was closing its case. FAC ¶ 121. Plaintiff filed this case on April 23, 2013.

**Legal Standard**

**Federal Rule of Civil Procedure 12(b)(1)**

9

A moving party may base a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) on the allegations of the complaint or by presenting extrinsic evidence. McCarthy v. United States, 850 F.2d 558, 560 (9th Cir. 1988); White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000). This Court must resolve jurisdictional issues as a threshold matter before addressing the merits of the case. Steel Co. V. Citizens for a Better Environment, 523 U.S. 83, 94 (1998). When subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff bears the burden of proving that jurisdiction exists. Thompson v. McCombe, 99 F.3d 352, 353 (9th Cir. 1996).

**Discussion**

Plaintiff requests that the Court convert this motion to dismiss into a motion for summary judgment and order discovery to further develop the record. The issue of whether Plaintiff exhausted his administrative remedies is a jurisdictional issue, which can be resolved by reference to extrinsic evidence. "Unlike a Rule 12(b)(6) motion, a Rule 12(b)(1) motion can attack the substance of a complaint's jurisdictional allegations despite their formal sufficiency, and in so doing rely on affidavits or any other evidence properly before the court." St. Clair v. City of Chico, 880 F.2d 199, 201 (9th Cir. 1989). Accordingly, the Court does not convert this motion to dismiss to a motion for summary judgment.

**1.    The only proper Defendant is Martin Gruenberg**

A federal employee may not assert a Title VII claim against individual federal employees. See Williams v. General Services Admin., 905 F.2d 308, 311 (9th Cir.1990); see also Romain v. Shear, 799 F.2d 1416, 1418 (9th Cir.1986) (per curiam) (the proper defendant in a Title VII action brought by a federal employee is the head of the employee's department, agency, or unit). Similarly, the proper defendant in a Rehabilitation Act claim is the head of the agency in his official capacity. See Barsten v. Department of the Interior, 896 F.2d 422, 423 (9th Cir. 1990). Here, the head of the FDIC is Martin Gruenberg. Therefore, Plaintiff's Title VII and Rehabilitation Act claims against defendants other than Mr. Gruenberg are dismissed without prejudice.

**2.    Title VII and the Rehabilitation Act are Plaintiff's exclusive remedies for claims of discrimination in federal employment**

Title VII provides the exclusive remedy for discrimination claims in federal employment.

10

See, e.g., Brown v. General Services Admin., 425 U.S. 820, 835 (1976) (". . . the established principle leads unerringly to the conclusion that s 717 of the Civil Rights Act of 1964, as amended, provides the exclusive judicial remedy for claims of discrimination in federal employment."); see also Boyd v. United States Postal Serv., 752 F.2d 410, 414 (9th Cir. 1985) (citing Brown, 425 U.S. at 835); Nolan v. Cleland, 686 F.2d 806, 815 (9th Cir. 1982) (citing Brown, 425 U.S. at 835 and stating: "The holding of Brown, supra, is controlling on this issue and we feel that such holding cannot be circumvented where the factual predicate for Nolan's due process claim is the discrimination which is the basis of her Title VII claim. The threshold question in Nolan's action is the constructive discharge claim and she would not be able to recover on the due process claim if she were successful on the constructive discharge claim due to the identical factual basis, and, therefore, the district court correctly dismissed the due process count and approached the action solely as a Title VII action pursuant to Brown, supra."). Similarly, the Rehabilitation Act "is the exclusive remedy for handicap discrimination claims by federal employees." Johnson v. Horne, 875 F.2d 1415, 1420 (9th Cir. 1989).

Plaintiff disputes the exclusivity of Title VII and the Rehabilitation Act, and argues that he can also state a claim under Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388, 394 (1971). However, because the purpose of Title VII was to create "an exclusive, pre-emptive administrative and judicial scheme for the redress of federal employment discrimination," Plaintiff may not bring additional causes of action into his Title VII complaint. Brown, 425 U.S. at 829; Nolan, 686 F.2d at 814. The same reasoning applies to the Rehabilitation Act. A narrow exception to this general rule exists where a federal employee may bring tort claims outside Title VII if "the conduct alleged is a highly personal violation beyond the meaning of workplace discrimination." See Sommatino v. United States, 255 F.3d 704, 711 (9th Cir. 2001). For example, in Brock v. United States, 64 F.3d 1421, 1423-24 (9th Cir.1995), the Ninth Circuit held that Title VII did not preempt a FTCA claim where the plaintiff, an employee of the Forest Service, alleged that during overnight field outings, her supervisor raped her. This case, however, does not come within that narrow exception. Plaintiff's tort claims are based on the same workplace discrimination as his Title VII and Rehabilitation Act claims. As Plaintiff's exclusive remedies are

11

under Title VII and the Rehabilitation Act, Plaintiff's other claims are dismissed with prejudice.

**3.     Moreover, Plaintiff has failed to exhaust his administrative remedies for his Title VII and Rehabilitation Act claims**

Under Title VII, a federal employee must exhaust his administrative remedies as a precondition to filing suit. Brown v. General Servs. Admin., 425 U.S. 820, 832 (1976) ("Initially, the complainant must seek relief in the agency that has allegedly discriminated against him."); see also Cooper v. Bell, 628 F.2d 1208, 1211 (9th Cir.1980) (Title VII "contemplates the invocation of administrative remedies as a condition precedent to litigation" by a federal employee) (citing Brown). The exhaustion requirement also applies to Rehabilitation Act claims. See Santos-Reyes v. Gonzales, 2007 WL 988182, at *3 (N.D. Cal. Apr. 2, 2007).

The Civil Service Reform Act of 1978 ("CSRA"), 5 U.S.C. § 7121, governs the interplay between collective bargaining agreements in federal employment and statutory employment procedures. Under the CSRA, a federal employee who believes he has been discriminated against and whose collective bargaining agreement provides for a negotiated grievance procedure addressing discrimination claims "may raise the matter under a statutory procedure or negotiated grievance procedure, but not both." See 29 CFR § 1614.301(a). "A federal employee who alleges employment discrimination must elect to pursue his claim under either a statutory procedure or a union-assisted negotiated grievance procedure; he cannot pursue both avenues, and his election is irrevocable." Vinieratos v. Air Force, 939 F.2d 762, 768-69 (9th Cir. 1991) (citing 5 U.S.C. § 7121(d)). An election is deemed made as follows:

> An employee shall be deemed to have exercised his option ... to raise the matter under either a statutory procedure or the negotiated procedure at such time as the employee timely initiates an action under the applicable statutory procedure or timely files a grievance in writing, ... whichever event occurs first.

5 U.S.C. § 7121(d).

"The CSRA does not countenance the dividing of proceedings according to legal theory." Santos-Reyes, 2007 WL 988182, at *4. In particular:

> When a person is employed by an agency subject to 5 U.S.C. 7121(d) and is covered by a collective bargaining agreement that permits allegations of discrimination to be raised in a negotiated grievance procedure, a person wishing to file a complaint or a grievance on a matter of alleged employment discrimination must elect to raise the matter under either part 1614 or the negotiated grievance procedure, but not both. An

> election to proceed under this part is indicated only by the filing of a written complaint; use of the pre-complaint process as described in § 1614.105 does not constitute an election for purposes of this section. *An aggrieved employee who files a grievance in writing with an agency whose negotiated agreement with an employee organization permits the acceptance of grievances which allege discrimination prohibited by this subpart, may not thereafter file [an EEO] complaint on the same matter under the provisions of this subpart irrespective of whether the grievance has raised an allegation of discrimination within the negotiated grievance procedure.*

29 CFR § 1614.301(a) (emphasis added); see also Macy v. Dalton, 853 F.Supp. 350, 354 (E.D. Cal.1994) ("The dictates of this regulation are clear: if an employee chooses the grievance route, she may not thereafter file an EEO complaint regardless of whether her grievance alleged unlawful discrimination. The employer/agency, in fact, is instructed by the regulation to reject any EEO claim filed by the employee after the grievance procedure has been elected."). In determining what constitutes the "same matter," courts look to the facts underlying the claims, not the legal theories asserted. See Macy, 853 F.Supp. at 354 ("matter" refers to the underlying government employment action).

Here, Plaintiff is covered by a collective bargaining agreement, and the complaint demonstrates that he used the negotiated grievance procedure in this case prior to attempting to invoke a statutory remedy under Title VII or the Rehabilitation Act. The complaint reveals that Plaintiff did not reach the end of that grievance procedure. Plaintiff filed his step 1 grievance regarding the LOW on May 29, 2011, and attended a step 1 hearing on June 28, 2011. FAC ¶¶ 71, 74, 79-80. On August 16, 2011, Plaintiff attended a step 2 hearing, and in September 22, 2011, he attended a step 3 hearing on September 22, 2011. Id. On October 6, 2011, Plaintiff received his step 3 grievance response. Id. He did not proceed to arbitration after step 3. None of Plaintiff's grievances included claims of gender or disability discrimination even though those claims could have been raised because Plaintiff knew at the time of the investigation and shortly thereafter that the decision-makers in his case were women. FAC ¶¶ 33-34. Thereafter, Plaintiff made his initial EEO contact in October 20, 2011, and again in July 2012. Scharf Decl. Ex. P, V.

The failure to fully exhaust his grievance is fatal to Plaintiff's claims, and the remedy is dismissal. Macy, 853 F.Supp. at 354-55, 358 ("Accordingly, the court holds that under 5 U.S.C. § 7121(d) and 29 C.F.R. § 1613.219(b), an employee who elects to file a grievance under a negotiated

13

procedure which permits the grievance of discrimination claims must exhaust his or her administrative remedies through that procedure. An employee cannot exhaust his or her administrative remedies by filing an EEO claim or an MSPB appeal *after* electing to file a grievance.") (emphasis in original); see also Harrison v. Rumsfeld, 2003 WL 22114266, at *2 (N.D. Cal. Sept. 8, 2003) ("In this case, plaintiff submitted written grievances under a collective bargaining agreement on May 23 and July 6, 2000. In these grievances, plaintiff challenged the propriety of his suspension. In so doing, plaintiff stated that 'he believe[d] discriminatory practices maybe [sic] an issue.' It was only after the grievance process had been initiated that plaintiff pursued relief through the EEO scheme, filing a formal EEO complaint on October 13, 2000. Furthermore, on January 2, 2001, plaintiff withdrew from the arbitration process, thus opting not to utilize any further the negotiated grievance process. Under the circumstances, plaintiff was not free to use EEO procedures to pursue relief concerning his suspension."); Martinez v. Snow, 2006 WL 3654618, at * (E.D. Cal. Dec. 12, 2006) (dismissing case for failure to exhaust administrative remedies where the plaintiff invoked the grievance procedure, but failed to see it through to the end); Guerra v. Cuomo, 176 F.3d 547 (D.C. Cir. 1999) ("It is undisputed that Guerra filed her grievance, in writing, in 1991. Notwithstanding HUD's failure to accommodate her to her satisfaction, Guerra failed to exhaust her remedies under the grievance procedures, never taking her grievance to Step 2 or Step 3 or to arbitration;" the court determined that the plaintiff' grievance and subsequently filed EEO complaint involved the same matter, so her EEO complaint was barred); Moreno v. McHugh, 2011 WL 2791240, at *4 (D. Md. July 14, 2011) (dismissing the plaintiff's claims for lack of jurisdiction: "Moreover, as indicated, it is undisputed that plaintiff filed her Step 2 Grievance before she filed her EEO complaint. Therefore, plaintiff's election stands, regardless of whether, at the time of her election, the agency had informed her 'of the need to elect' or 'whether the grievance has raised an issue of discrimination.'" 29 C.F.R. § 1614.301(a)."); Santos-Reyes, 2007 WL 988182, at *5 ("Abandonment or failure to cooperate in the administrative process prevents exhaustion and precludes judicial review.").

Plaintiff argues that he exhausted his administrative remedies by filing an EEO complaint in July 2012, after which the agency issued a final decision in December 2012, which Plaintiff received

in January 2013. Opp. at 14. Plaintiff states that he requested a grievance review by the OFO, but as the deadline for the federal lawsuit drew near, he decided to file suit, and so notified the OFO, which closed his case. Id. However, an EEO complaint filed after the grievance procedure has been selected is essentially a nullity, and cannot revive an unexhausted claim.

Plaintiff also argues that he did not voluntarily abandon his grievance procedure, but that the union failed to honor Plaintiff's request to take the complaint to arbitration. Opp. at 14. Plaintiff cites no facts to support this explanation, or legal authority that such a failure would excuse Plaintiff from the consequences of lack of exhaustion. A union may lawfully refuse to take a grievance to the final step, provided it does not breach its duty of fair representation (e.g., if it reasonably believes that to continue the grievance would be futile because it could not prevail), and an employee may not pursue the matter further against its employer unless it first proves the union breached that duty. See Vaca v. Sipes, 386 U.S. 171, 186 (1967) ("For these reasons, we think the wrongfully discharged employee may bring an action against his employer in the face of a defense based upon the failure to exhaust contractual remedies, provided the employee can prove that the union as bargaining agent breached its duty of fair representation in its handling of the employee's grievance."). In the alternative, even if Plaintiff's claims were not barred by failure to exhaust, he would still be barred from bringing discrimination claims in this forum because he did not raise those claims in the grievance process and so could not have exhausted them.

**Conclusion**

Because Plaintiff's sole remedies lie in Title VII and the Rehabilitation Act claims against Defendant Gruenberg alone, and because Plaintiff failed to exhaust his administrative remedies with respect to those claims, the Court need not reach Defendant's other arguments raised in the motion. Defendant's Motion to Dismiss is granted, including the claims against individual Defendants, and leave to amend is denied.

**IT IS SO ORDERED.**

Dated: August 26, 2013

ELIZABETH D. LAPORTE
United States Chief Magistrate Judge